UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLON O. DAVIS,<br>    Plaintiff,<br>    v.<br>G. KALISHER, et al.,<br>    Defendants. | Case No. 15-cv-05997-SI<br><br>**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS**<br>Re: Dkt. Nos. 27, 30 |

## INTRODUCTION

Marlon Davis, formerly an inmate at the Correctional Training Facility in Soledad, filed this *pro se* civil rights action under 42 U.S.C. § 1983. This action is now before the court for consideration of the motion for summary judgment filed by defendants and opposed by Davis. For the reasons discussed below, summary judgment will be granted in defendants' favor.

## BACKGROUND

This action concerns the responses of three prison doctors to Davis' eye problems. Davis contends that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by their deliberate indifference to his eye care needs. He also contends that defendants violated their duties under California Government Code § 845.6 to provide immediately needed medical care when they failed to arrange for him to have eye surgery.

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to this action occurred from about June 2014 through April 2016, at the Correctional Training Facility (CTF). At the relevant time, Davis was a prisoner at CTF. After filing this action, Davis was released from prison in about April 2016. *See*

1  Docket No. 5.) At the relevant time, defendants G. Kalisher, M.D., Z. Ahmed, M.D., and S. Posson, D.O. were on the medical staff at CTF.

The first events alleged in Davis' amended complaint occurred in June 2014. Prior to that, he had requested and received refills of his eye drops in October 2013 and February 2014 for his "irritated eyes." (Docket No. 27-3 at 2-3.) The Naphcon-A eye drops ordered for him are used to relieve eye redness, itching, and watering that commonly occur with allergies. (Docket No. 27-2 (Posson Declaration) at 2-3 & n.1.)

On June 14, 2014, Davis submitted a form requesting care for a "throbbing pain" in his left eye that was "causing redness and irr[i]tation." (Docket No. 27-3 at 4.)[1] He was seen by a nurse on June 15, 2014. (*Id.*) Dr. Kalisher examined Davis on June 30, 2014, and made an urgent request for Davis to see an optometrist. (Docket No. 27-3 at 5-7.) Dr. Bright approved the request. According to Davis, Dr. Kalisher did not give Davis any ice packs or medications to relieve swelling of the eye, and did not prescribe Restasis eye drops on this day. (Docket No. 6 at 5.) (Defendants dispute this. The court accepts Davis' version as true for purposes of resolving the motion for summary judgment.)

On July 2, 2014, optometrist Reed Sammet examined Davis. Dr. Sammet suspected that Davis had glaucoma and also noted "pterygium OS."[2] He prescribed Artificial Tears ophthalmic solution, which is a lubricant eye drop used to relieve dry and irritated eyes. Dr. Sammet also wrote a prescription for new eyeglasses. (Docket No. 27-2 at 3 & n.3; Docket No. 27-3 at 8-9.)

On July 3, 2014, Dr. Kalisher followed up with Davis regarding the eye pain. Dr. Kalisher prescribed LiquiTears for 90 days. LiquiTears are lubricant eye drops used to relieve dry eye symptoms like burning and irritation. Dr. Kalisher's notes also mentioned "possible glaucoma?"

---

[1] Davis' requests for health care often requested care for more than one problem. For example, on June 14, 2014, he requested care for eye problems and urinary problems, and on November 6, 2014, he requested care for eye problems and wrist soreness. See (Docket No. 27-3 at 4, 14.) The court does not further discuss Davis' requests for care for other than the eye problems, because Davis has only asserted claims about eye care and there is no suggestion his other medical problems had any bearing on his eye problems.

[2] The medical records contain references to OD and OS. OD refers to oculus dexter, or the right eye. OS refers to oculus sinister, or the left eye.

2

(Docket No. 27-2 at 3 & n.4; Docket No. 27-3 at 10.)

On July 15, 2014, Dr. Sammet requested that Davis receive treatment for glaucoma, and recommended that Davis begin treatment with Latanoprost for a year. Latanoprost is an ophthalmic solution used to treat glaucoma. (Docket No. 27-2 at 3 & n.5; Docket No. 27-3 at 11.)[3] Dr. Kalisher ordered Latanoprost eye drops for Davis the next week. (Docket No. 27-2 at 3; Docket No. 27-5 at 12.)

On August 6, 2014, Davis requested refills for his Latanoprost and LiquiTears prescriptions. The prescriptions were refilled the next day. (Docket No. 27-2 at 3-4; Docket No. 27-3 at 13.)

On August 13, 2014, Davis had a glaucoma progress evaluation with Dr. Sammet. Dr. Sammet recommended a four-month follow-up appointment and possible second ocular hypotensive medication if the internal eye pressure increased to greater than 15 mm. (Docket No. 27-2 at 4; Docket No. 27-3 at 12.)

On November 6, 2014, Davis submitted a form requesting care for pain in his left eye causing him headaches. (Docket No. 27-3 at 14.) Dr. Kalisher examined Davis on November 10, and submitted an urgent request for Davis to see an optometrist. (Docket No. 27-2 at 4; Docket No. 27-3 at 15-17.)

Dr. Shao Li, an optometrist, examined Davis on November 19, 2014. Dr. Li noted that Davis' internal eye pressure had increased to 16 mm. in both eyes and wrote a new prescription for eyeglasses. (Docket No. 27-2 at 4; Docket No. 27-3 at 18; Docket No. 27-4 at 2-3.)

Davis had a follow-up appointment with Dr. Kalisher on November 21, 2014, and received his new eyeglasses on December 12, 2014. (Docket No. 27-2 at 4; Docket No. 27-3 at 18; Docket No. 27-4 at 3.)

---

[3] Dr. Posson states that Dr. Kalisher discontinued Davis' prescription for LiquiTears that day, but he appears to be off by a year: the medical record he cites shows that the LiquiTears were discontinued on July 15, 2015, rather than July 15, 2014. (Docket No. 27-2 at 3; Docket No. 27-5 at 14.) A medication record dated July 23, 2014 shows that the Latanoprost was started on July 23, 2014, and has an unreadable note about the LiquiTears. (Docket No. 27-5 at 12.)

3

On December 13, 2014, Davis submitted a form requesting that he be sent to an outside specialist. He complained that the pain in his left eye was "getting more intense," and wanted to see an outside specialist because the treatment he was receiving in prison was not effective, in his view. (Docket No. 27-4 at 4.) Dr. Kalisher examined Davis on December 19, and submitted an urgent request for Davis to see an ophthalmologist, which Dr. Bright approved that day. (Docket No. 27-2 at 4; Docket No. 27-4 at 5-6.)

Dr. Rasheed, an ophthalmologist, examined Davis on January 5, 2015. Dr. Rasheed suspected Davis had ocular hypertension rather than glaucoma, and advised stopping the glaucoma medication. He also recommended an offsite follow-up appointment. (Docket No. 27-2 at 4; Docket No. 27-4 at 6.)

On February 10, 2015, Davis had a follow-up appointment with Dr. Kalisher and reported that the pain in his eye was better but still persisted. (Docket No. 27-2 at 4; Docket No. 27-4 at 7.)

On April 28, 2015, Davis submitted a form requesting care for his left eye because he was experiencing more eye pain and "eye drops are no avail." (Docket No. 27-4 at 8.) A registered nurse examined him on April 30, and provided him with Artificial Tears. (Docket No. 27-2 at 5; Docket No. 27-4 at 9.)

On May 6, 2015, Dr. Brent Wells, an optometrist, examined Davis and noted "physiological large cupping v. glaucoma" and dry eye syndrome. Dr. Wells recommended that Davis use warm compresses and artificial tears, and have yearly follow-up appointments. (Docket No. 27-2 at 5; Docket No. 27-4 at 10.)

On May 15, 2015, Davis submitted a form requesting care for his continued pain and irritation in the left eye. He wrote that "the artificial-tears solution are no. avail," and he wanted to see an off-site specialist. (Docket No. 27-2 at 5; Docket No. 27-4 at 11.) On May 18, a registered nurse examined Davis and wrote that he had an appointment scheduled for May 27 with Dr. Kalisher. (Docket No. 27-2 at 5; Docket No. 27-4 at 11-1.)

On May 5 or 22, 2015, Davis filed an inmate health care appeal stating that he had been seeing medical care providers for some time, the "artificial tears are not effective" and he was having vision troubles. He requested that he be sent to see an off-site specialist for more effective

4

treatment. (Docket No. 27-5 at 25 (appeal form dated May 22); (Docket No. 6 at 6 (verified allegation that appeal was filed on May 5, 2015). Davis also requested Restasis eye drops in this appeal, or in an appeal dated July 11, 2015 that was attached to the May 5 or 22, 2015 appeal. (Docket No. 27-5 at 23.)

On June 5, 2015, Dr. Kalisher examined Davis, noted that Davis had dry eye syndrome, and requested Restasis eye drops. (Docket No. 27-2 at 5; Docket No. 27-4 at 16. (Davis apparently had learned about Restasis drops on television. (Docket No. 6 at 5.))

On June 15, 2015, Davis requested care for his left eye, which was painful and "sticking with dryness," and the "drops are no avail." (Docket No. 27-4 at 17. A registered nurse examined him the next day and referred him to his primary care provider. (Defendants urge that the phrase "drops are no avail." meant drops were to no avail; Davis does not disagree.)

On June 17, 2015, Dr. Posson (who was the chief medical executive at the prison) denied Dr. Kalisher's request to prescribe Restasis eye drops. (Docket No. 27-4 at 16.) Dr. Posson explains his reasoning:

> Restasis is a non-formulary eye drop medication that we do not usually use in prisons because it is an immune modulator. Immune modulators make a person more susceptible to infections and given the amount of bacteria in prisons, we try to stay away from them. Thus, we consider alternative treatments before resorting to immune modulators. Here, I noticed that Mr. Davis was taking two medications known to cause dry eyes as a side-effect, Atomoxetine [Strattera] and Sertraline. (AG 0129). Thus, I advised discontinuing these medications first to see if they alleviated any of Mr. Davis's symptoms before resorting to non-formulary Restasis.

(Docket No. 27-2 at 6 (alteration in original).)

Davis requested on June 21, 2015 to change primary care providers because he wanted "a more assertive therapy" than that being provided by Dr. Kalisher. (Docket No. 27-2 at 6; Docket No. 27-4 at 18.)

Dr. Ahmed interviewed Davis on June 22, 2015 about his health care appeal and denied the appeal at the first level. Dr. Ahmed noted the issue to be a request to see an offsite specialist, and wrote that "[w]e do not refer off site doctor for dry eye syndrome." (Docket No. 27-5 at 27-28.) According to Davis, Dr. Ahmed also denied the requests for Restasis drops. (Docket No. 6 at 6; Docket No. 27-5 at 27-28.) (The court accepts Davis' version as true for purposes of the motion

5

for summary judgment.)

On July 1, 2015, Davis submitted a form requesting care for his left eye, as he still had pain and the ointment was not working. (Docket No. 27-2 at 6; Docket No. 27-4 at 20.) A nurse evaluated him and contacted Dr. Kalisher, who requested that Davis be scheduled for an appointment on the next available date. Dr. Kalisher examined Davis on July 15, and noted he needed a follow-up appointment with the optometrist. (Docket No. 27-2 at 6; Docket No. 27-4 at 20-21.)

On August 12, 2015, Davis submitted a form requesting care for his left eye, which was irritated and causing headaches. (Docket No. 27-4 at 23.) A nurse evaluated him on August 14, 2015, and referred him to a doctor. (*Id.*) On August 29, 2015, Dr. Kalisher examined Davis, and noted that Davis refused eye drops and requested to be medically unassigned. (Docket No. 27-2 at 7; Docket No. 27-5 at 2.) (It is not clear from the record whether the request to be medically unassigned was due to eye pain, hernia pain, or anxiety about school -- all of which were mentioned in the doctor's note. (Docket No. 27-5 at 2.))

Meanwhile, on August 13, 2015, Dr. Posson partially granted Davis' health care appeal at the second level. (Docket No. 27-5 at 29-30.) Dr. Posson granted the request to see an ophthalmologist, and denied his request for Restasis as not medically indicated. (Docket No. 27-2 at 6.)

On September 18, 2015, ophthalmologist Dr. Rasheed examined Davis for the second time. Dr. Rasheed's impressions were that Davis had normal eye pressures, "does not have glaucoma," had chronic allergic conjunctivitis, and had a pterygium in his left eye. Dr. Rasheed recommended surgery to correct the pterygium and long term Naphcon-A as needed for the allergic conjunctivitis. Dr. Rasheed did not explain why he recommended surgery to remove the pterygium. (Docket No. 27-2 at 7; Docket No. 27-5 at 3-4.)

Dr. Posson discusses pterygia in his declaration:

Pterygium is a benign fleshy growth of tissue on the surface of the white part of the eye (conjunctiva) that grows over the front of the cornea (clear window at the front to the eye). Pterygium usually grows very slowly, over many years. Common symptoms include redness and irritation. Extreme symptoms include impaired vision and restricted eye movement, which occur when the growth covers the

6

> central area of the cornea. Patients with pterygium that does not impair vision or restrict eye movement may be treated symptomatically with topical lubricants including drops, ointments, and gels, all of which are available over-the-counter. Artificial tears are the most frequently utilized topical lubricant for pterygium. Surgery however, is recommended when the pterygium covers the central area of the cornea, impairing vision and restricting eye movement. Redness and discomfort are best treated with simple methods like lubricant eye drops rather than surgery. This is because recurrent pterygium is common after surgery, and can be more symptomatic and problematic to eliminate than primary pterygium. These factors should be taken into consideration when surgery is contemplated for small pterygium, irritation, or for cosmetic reasons alone.

(Docket No. 27-2 at 7.)

Dr. Posson questions whether Dr. Rasheed's notes show a need for pterygium surgery. Dr. Posson observes that Dr. Rasheed had noted that Davis' corneas were clear, and did not note any extreme symptoms, such as impaired vision or restricted eye movement. (Docket No. 27-2 at 7; Docket No. 27-5 at 3-4.)

On September 23, 2015, Davis submitted a request for care for his left eye, and wrote that he was experiencing inflammation, increased irritation and headaches. (Docket No. 27-2 at 8; Docket No. 27-5 at 5.) He also requested the eye drops Dr. Rasheed had prescribed. A nurse examined Davis the next day and informed Davis that he would be seen on September 29, 2015. On September 29, 2015, Dr. Mulligan-Pfile (another primary care provider) examined Davis. Dr. Mulligan-Pfile noted that Davis had "small pterygium at medial aspect not encroaching upon iris," and that Davis denied vision loss or eyeball pain. (Docket No. 27-5 at 6.) She wrote that the patient was "informed today that pterygia not covered by Title 15 and surgery is not indicated" for the "non-obstructive pterygium." (*Id*.)

Dr. Mulligan-Pfile's mention of "Title 15" referred to a portion of the California Code of Regulations. A regulation applicable to California prisoners provides that "[s]urgery not medically necessary shall not be provided." Cal. Code Regs., tit. 15, § 3350.1(b). "Medically Necessary means health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care." *Id.* at § 3350(b)(1). "Severe pain means a degree of discomfort that significantly disables the patient from reasonable independent function." *Id.* at § 3350(b)(4).

7

Dr. Posson opines that it "was proper" for Dr. Mulligan-Pfile to determine that surgery was not medically indicated because Davis' pterygium was nonobstructive and because Davis had denied vision loss. (Docket No. 27-2 at 8.)

On October 24, 2015, Davis submitted a request for care for his painful, irritated and chronically dry left eye. (Docket No. 27-2 at 8; Docket No. 27-5 at 7.) A registered nurse examined him on October 26, and referred him to his primary care provider. Dr. Mulligan-Pfile examined Davis on November 6, 2015, noted that he had no vision changes, and prescribed Lacri-lube gel for his eye. (Docket No.. 27-2 at 9; Docket No. 27-5 at 8.) Lacri-lube gel is an eye lubricant that provides tear-like lubrication for relief of dry eyes and eye irritation. (Docket No. 27-2 at 9 n.6.)

Davis continued to receive treatment and eye drops in the ensuing months at the prison, until he was paroled on April 24, 2016.

Dr. Posson opines that the medical treatment Davis received at CTF for his eye symptoms "was attentive and professional at all times," and that the defendants' medical care "was according to the standards of the medical community in which [they] practice." (Docket No. 27-2 at 9.)

After he was released from prison, Davis received care from ophthalmologists at West Coast Eyecare Associates in National City, California ("West Coast"). (Docket No. 30-2.) He has submitted some records from West Coast.

Davis was seen by a West Coast doctor on July 1, 2016, about ten weeks after he was paroled. The doctor noted that he would schedule surgery for the pterygium and ordered Refresh eye drops. (Docket No. 30-2 at 3 ("will schedule ptg sx left eye, explained small, but bothered by it, pain, irritation, gave [R]efresh."))

Davis was seen again on August 22, 2016 by Dr. Prabhu at West Coast for a pre-op appointment before the surgery. Dr. Prabhu's notes state that he discussed with Davis "observation vs removal" of the pterygium; the "risks including scarring, recurrence, and post operative discomfort. Explained that headaches may be unrelated to pterygium and may persist and need further evaluation with PCP post operatively if [they] continue." (Docket No. 30-3 at 4.)

1  Davis had pterygium surgery on August 24 or 25, 2016. (Docket No. 30-4.) The pathology report showed no evidence of a malignancy. (Docket No. 30-7 at 3.) Davis had follow-up appointments in September and October 2016.

At an appointment for new eyeglasses on November 4, 2016, Davis was concerned about ptosis in his left eye; the doctor noted that they "[d]icussed ptosis vs dermatochalasis." (Docket No. 30-8 at 4.) This is the earliest mention in the medical records of ptosis (i.e., drooping eyelid) or dermatochalasis (i.e., baggy eyes).

On December 1, 2016, Davis was seen by Dr. Prabhu for complaints of a drooping eyelid and drooping brow over his left eye. The doctor's note also suggests that Davis had an early recurrence of the pterygium in the left eye. (Docket No. 30-9.)

On April 3, 2017, Dr. Binder at West Coast noted that there was a recurrent pterygium in Davis' left eye, and that Davis was "still with significant irritation despite AFTs and ointment." (Docket No. 30-10.) The doctor prescribed Restasis – the first time that medication is mentioned in the West Coast doctors' notes in the nine months Davis had been seeing those doctors.

There is no evidence that Davis ever presented a claim to the California Victim Compensation and Government Claims Board concerning defendants' responses to his eye care needs.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the complaint occurred in Monterey County, located in the Northern District. See 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment

9

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Davis' amended complaint was signed "under penalty of perjury" and the facts therein are considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631.

**DISCUSSION**

A.  Eighth Amendment Claim

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). The evidence in the record suffices to allow a jury to conclude that Davis' chronic eye problems presented a serious medical need.

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See*

11

*Jett*, 439 F.3d at 1096.

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, [an inmate] must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the inmate's] health.'" *Toguchi*, 391 F.3d at 1058.

Prison officials cannot avoid Eighth Amendment liability by simply declaring that they disagree with a specialist's or treating doctor's prescribed course of care. The limits of the difference-of-opinion rule were illustrated in *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), *overruled on other grounds* by *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014), where the Ninth Circuit determined that the district court erred in granting summary judgment for defendants who urged that their refusal to approve double hip-replacement surgery for a prisoner who could barely walk due to hip pain showed a mere difference of opinion. In *Snow*, the prison medical committee repeatedly refused to authorize a double hip-replacement surgery, even though an orthopedic surgeon and the prisoner's treating physician considered the requested surgery to be an emergency. *See id.* at 986. Not only had the medical committee refused to authorize the surgery, the committee "gave no medical reason for the denials" and some evidence suggested the refusal was due to the warden's dislike of death row prisoners such as the plaintiff. *Id.* at 986-87. *Snow* rejected the defendants' argument that their choice to treat the prisoner with medications rather than surgery showed merely a difference of opinion that did not amount to an Eighth Amendment violation. *Id.* at 987-88. Although there was "clearly a difference of medical opinion," the evidence in the record and inferences therefrom could allow a reasonable jury to "conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances." *Id.* at 988. Significantly,

1   the defendants sent the prisoner for evaluation by orthopedic surgeons, both of whom
2   recommended double hip-replacement surgery. *Id.* One of those surgeons testified at his
3   deposition that the prisoner's likelihood of success after the surgery was very high, that surgery
4   would help improve the prisoner's health and mobility, and that the surgery would allow the
5   prisoner to avoid the use of the medications that were causing other health problems for the
6   prisoner. On this record, "it should be for the jury to decide whether any option other than surgery
7   was medically acceptable." *Id.* The court acknowledged that "a medication-only course of
8   treatment may have been medically acceptable for a certain period of time," but saw the multi-year
9   delay in approving the recommended surgery as presenting a triable issue as to medical
10  acceptability of defendants' course of treatment under the circumstances. *Id.*

11  *Snow* did not hold that a triable issue is shown whenever prison officials fail to follow a
12  doctor's recommended course of care. Indeed, *Snow*'s discussion shows that it was the reflexive
13  denial-without-medical-reason behavior of prison officials that could allow a jury to conclude that
14  the prison officials had acted with deliberate indifference to the medical need. The Ninth Circuit
15  distinguished Snow's situation from that in *Toguchi*, where the plaintiff challenged the defendant-
16  doctor's choice to discontinue a particular medication but did not present expert testimony
17  showing that the discontinuation of the medication was medically unacceptable, and the
18  defendant-doctor had submitted expert testimony that her actions met the standard of care. *See
19  Snow*, 681 F.3d at 988-89 (citing *Toguchi*, 391 F.3d at 1055-56). The Ninth Circuit also
20  distinguished *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989), on the basis that "only one
21  prison doctor told the inmate that surgery would be necessary" in *Sanchez*, whereas "the consistent
22  recommendation by two outside specialists over the course of three years" in *Snow* was that the
23  prisoner needed double hip-replacement surgery to alleviate his severe pain and mobility issues.
24  *Snow*, 681 F.3d at 989.

25  Having carefully reviewed the evidence, the court concludes that no reasonable jury could
26  find that defendants' responses to Davis' eye care needs amounted to deliberate indifference. The
27  undisputed evidence shows that Davis submitted 11 requests for eye care from June 2014 through
28  his release from prison in April 2016, and that Davis was seen by a medical care provider (i.e.,

13

doctor, nurse or optometrist) at least 24 times. The medical care providers ordered several different eye drops and/or ointments for Davis on several different occasions in response to his continued complaints of eye problems and sent him to specialists. Dr. Kalisher (Davis' primary care provider) submitted urgent requests for Davis to see an optometrist on several occasions, and submitted an urgent request for Davis to see an ophthalmologist on another occasion. None of these requests were denied. As a result of Dr. Kalisher's requests, Davis was seen by an optometrist five times, and was seen by an ophthalmologist one time. Dr. Posson granted in part Davis' inmate appeal; as a result of Dr. Posson's decision on the appeal, Davis was seen by the ophthalmologist a second time. Although there is ample evidence that Davis repeatedly requested care for problems with his left eye, the undisputed evidence also shows that prison medical providers repeatedly examined him and provided care for those eye problems.

Davis points to two specific ways in which he feels the defendants failed him. First, Davis contends that defendants were deliberately indifferent in failing to provide the pterygium surgery recommended by the ophthalmologist, Dr. Rasheed. Even viewing the evidence and inferences therefrom in the light most favorable to Davis, no reasonable trier of fact could find that their denial was "'medically unacceptable under the circumstances,'" done "'in conscious disregard of an excessive risk to [Davis'] health.'" *Toguchi*, 391 F.3d at 1058. Davis presents no evidence to controvert defendants' evidence that "[p]atients with pterygium that does not impair vision or restrict eye movements may be treated symptomatically with topical lubricants," and that surgery (rather than topical lubricants) "is recommended when the pterygium covers the central area of the cornea, impairing vision and restricting eye movement." (Docket No. 27-2 at 7.) Nor does Davis dispute defendants' evidence that, notwithstanding his recommendation for surgery, Dr. Rasheed did not note why he recommended surgery and his findings suggested surgery was not necessary, i.e., Davis had clear corneas, and no impaired vision or restricted eye movements were noted. Unlike the situation in *Snow*, and like the situation in *Toguchi*, defendants presented medical reasons for their choice to deny that which the plaintiff contends should have been provided. Dr. Mulligan-Pfile determined in September 2015 that surgery was unnecessary because it was a nonobstructive pterygium, and Dr. Posson's expert declaration amplifies on that same reasoning.

14

And, as in *Toguchi*, Davis does not present expert evidence to show that defendants' course of care was medically unacceptable.

Davis' own evidence undermines his suggestion that pterygium surgery was the only acceptable response to his eye problems. His private doctor apparently considered monitoring the condition to be an acceptable alternative, as he discussed with Davis "observation vs removal" of the pterygium. (Docket No. 30-3 at 4.) The private doctor noted that surgery had risks (e.g., "scarring, recurrence, and post operative discomfort") and explained that Davis' headaches might persist after surgery. (Docket No. 30-3 at 4.) The pterygium did in fact recur within just a few months of the surgery, and Davis continued to have significant irritation in his eye a few months after the surgery. (Docket No. 30-9.)

Second, Davis contends that defendants were deliberately indifferent in failing to provide Restasis eye drops for him. As to the medical necessity of Restasis eye drops, Davis offers nothing more than an assertion that a television commercial promoted Restasis eye drops as a treatment for chronic dry eyes. The sales pitch in a television commercial plainly does not establish the standard of care in the medical community. Davis provides no competent evidence that Restasis would have had curative or palliative properties unavailable from any of the other treatments the prison medical staff provided to him. Defendants' evidence shows that the refusal to provide Restasis eye drops was not medically unacceptable: Restasis is an immune modulator that could have made Davis more vulnerable to infections in the prison environment. Davis also does not show that it was medically unacceptable for Dr. Posson to advise prison doctors (as an alternative to using Restasis) to address the complaints of dry eyes by discontinuing two of Davis' medications that were known to cause dry eyes as a side-effect.

As with the surgery, Davis' post-prison medical records undermine his suggestion that the failure to prescribe Restasis reflected deliberate indifference. The private doctors -- unburdened by the constraints of the allegedly deficient prison medical care system -- did not prescribe Restasis until April 3, 2017 -- nine months after Davis had started seeing those private doctors, and almost a year after he was released from prison. This strongly supports the determination that Restasis was not the only medically acceptable way to address Davis' chronic eye problems.

15

A physician is not required to be a guarantor of a patient's good health, regardless of whether the patient is in prison or at liberty. What the prison physician cannot do is be deliberately indifferent to an inmate's serious medical needs. Davis fails to present evidence that would allow a reasonable jury to find any defendant was deliberately indifferent to his eye care needs. When the evidence is viewed in the light most favorable to Davis, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against Drs. Kalisher, Ahmed, and Posson on his Eighth Amendment claims regarding his eye care. Drs. Kalisher, Ahmed, and Posson therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.[4]

B. <u>State Law Claim Under California Government Code § 845.6</u>

Defendants argue that Davis' state law claim under California Government Code § 845.6 is barred because he failed to allege or show compliance with the claim-presentation requirement of the California Government Claims Act. The court agrees.

The California Tort Claims Act, *see* Cal. Gov't Code §§ 810, et seq. -- commonly referred to as the California Government Claims Act by the courts, *see City of Stockton v. Super. Ct.*, 42 Cal. 4th 730, 741-42 (Cal. 2007) -- requires a person to present his claim to the California Victim Compensation and Government Claims Board ("Board") before he may file an action for damages against a California governmental entity or employee for personal injury or death. *See* Cal. Gov't Code §§ 905.2, 911.2, 945.4, 950.2. The Government Claims Act has strict time limits for filing such a claim with the Board *and* for filing an action in court after the rejection of such a claim. A claimant must present his personal injury tort claim to the Board within six months of the accrual of the cause of action. *See* Cal. Gov't Code § 911.2. Additionally, an action against a governmental entity or employee covered by the claim-presentation requirement must be filed

---

[4] Having determined that the Eighth Amendment claim fails on the merits, the court does not address the separate question of whether the inmate appeal David filed suffices to exhaust administrative remedies for his claim that he was denied pterygium surgery.

16

within six months following written notice of rejection of the claim by the Board. *See* Cal. Gov't Code § 945.6(a)(1).

Davis had to present his personal injury tort claim against a state employee or entity to the Board within six months of the accrual of the cause of action. His cause of action accrued no later than April 24, 2016, when he was paroled from prison and defendants' medical care (including the allegedly inadequate treatment) for him ended. It is undisputed that Davis did not present a personal injury tort claim to the Board within six months of the accrual of the cause of action. Timely claim presentation is "a condition precedent to plaintiff's maintaining an action against [a state employee or entity] defendant." *California v. Super. Court (Bodde)*, 32 Cal. 4th 1234, 1240 (Cal. 2004). It is undisputed that Davis did not present a claim to the Board. Therefore, his state law claim is dismissed because Davis did not comply with the claim-presentation requirement of the California Government Claims Act.

Davis alleged in his amended complaint that he "has not utilized the Administrative process for Damages, based upon 'Futility.' All administrative Remedies are (Exhausted)." (Docket No. 6 at 2.) This assertion does not save his state law claim because a "[p]laintiff's obligation to exhaust the administrative remedies available to prisoners . . . is independent of the obligation to comply with the Government Claims Act." *Parthemore v. Col*, 221 Cal. App. 4th 1372, 1376 (Cal. Ct. App. 2013); *see also Martinez v. Tilton*, 2013 WL 5670869, *3 (E.D. Cal. 2013) ("the prison's inmate appeals process and the Government Claims Act process are separate processes and there is no support for a finding that the allegedly improper cancellation of Plaintiff's inmate appeal had any effect whatsoever on his ability to timely present his Government Claims Act claim.") The alleged futility of seeking relief in the California prison grievance system did not excuse the duty to present a claim in compliance with California's Government Claims Act. Davis did not need to wait for prison administrative remedies to be exhausted to file a claim with the Board, and he could have filed a state law action as soon as he received a rejection of his claim from the Board. If he wanted to also pursue a § 1983 claim, he could have amended his complaint in that action or filed a second action to assert his § 1983 claim after exhausting prison administrative remedies. Davis' state law claim is dismissed.

17

C. <u>Davis' Motions</u>

After defendants filed their motion for summary judgment, Davis filed a motion to dismiss defendants' motion, arguing against defendants' motion for summary judgment and presenting his post-incarceration medical records. (Docket No. 30.) Davis has shown no legal basis for a "dismissal" of defendants' motion for summary judgment. For that reason, Davis' motion to dismiss the motion for summary judgment is DENIED. (Docket No. 30.) The court has, however, treated Davis' motion (Docket No. 30), as well as his 2-page opposition (Docket No. 32), as Davis' opposition to defendants' motion for summary judgment.

Davis also moved for reconsideration of the ruling in the order at (Docket No. 18) denying his request for appointment of counsel. To seek reconsideration of an interlocutory order, a party must obtain leave of court to file a motion for reconsideration, and show: (1) that at the time of the motion for leave to file a motion for reconsideration, a material difference in fact or law exists from that which was presented to the court before entry of the order for which the reconsideration is sought, and that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the earlier order; or (2) the emergence of new material facts or a change of law occurring after the time of such order; or (3) a manifest failure by the court to consider material facts or dispositive legal arguments which were presented to the court before such interlocutory order. *See* N.D. Cal. Civil L.R. 7-9(b). Davis did not show any of those things. Davis' motion for reconsideration of the order denying his request for counsel is DENIED. (Docket No. 30-1.)

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED. (Docket No. 27.) Defendants are entitled to judgment as a matter of law on plaintiff's claims. Plaintiff's (a) motion to dismiss the motion for summary judgment and (b) motion for reconsideration of the denial of his motion

for appointment of counsel are DENIED. (Docket Nos. 30 and 30-1.) The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: June 5, 2017

SUSAN ILLSTON
United States District Judge